```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ X
                                     :
TAHIR MAHMOOD,                       :
                                     :
                         Plaintiff,  :    11 Civ. 5345(KBF)
                                     :
            -v-                      :    OPINION & ORDER
                                     :
RESEARCH IN MOTION LTD.,             :
                                     :
                         Defendant.  :
                                     :
------------------------------------ X
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: MAY 16 2012

KATHERINE B. FORREST, District Judge:

This dispute arises from the inventorship of a patent integral to defendant Research in Motion Limited's ("RIM") BlackBerry products. A bench trial on the applicability of the laches doctrine to plaintiff Tahir Mahmood's ("plaintiff") correction-of-inventorship claim was held on April 19, 2012. The issue at the bench trial was, specifically, whether RIM suffered economic prejudice as a result of plaintiff's delay in bringing suit. Based on the findings of facts and conclusions of law below, this Court finds that the laches doctrine bars this action and accordingly dismisses it with prejudice.

## BACKGROUND

On August 1, 2011, Tahir Mahmood brought an action against RIM asserting a claim for correction of inventorship on one of

RIM's core patents relating to its BlackBerry products.[1] In the same action, plaintiff asserted state law claims for conversion, unfair competition and unjust enrichment. Defendant moved to dismiss plaintiff's claims on the basis of, *inter alia*, statute of limitations and laches; this Court converted that motion to one for summary judgment (see Notice, Dec. 1, 2011).

On January 23, 2012, this Court granted summary judgment in favor of defendant RIM as to all of plaintiff's state law claims, found that defendant had established a presumption of laches with respect to the correction-of-inventorship claim, but that plaintiff had rebutted that presumption by showing a lack of evidentiary or economic prejudice resulting from the unreasonable delay in bringing suit. Mahmood v. Research in Motion Ltd., No. 11 Civ. 5345, 2012 WL 242836, at *8 (S.D.N.Y. Jan. 24, 2012). Familiarity with the facts of this case, as set out in the Court's January 23, 2012 summary judgment opinion, is assumed.

On February 3, 2012, plaintiff filed a related suit, captioned Mahmood v. Research in Motion Ltd., 12 Civ. 0899, alleging a need for correction of inventorship and asserting various state law claims relating to five additional patents/patent applications that are part of the same family as

---

[1] The patent at issue is U.S. Patent No. 6,219,694 (the "'694 patent"). That patent was the first in what has become a large family of related patents now numbering over 120 worldwide with over 4,000 claims. (Tr. at 70:3-6, April 19, 2012.)

2

the '694 patent: U.S. Patent No. 7,386,588 B2, U.S. Patent No. 6,463,464 B1, U.S. Patent No. 6,389,457 B2, U.S. Patent Application Publication No. 2008/0052365 A1, and U.S. Patent Application Publication No. 2008/0052409 A1. Each of these patents/applications was obtained/filed after the '694 patent issued. On the basis that this new lawsuit demonstrated that RIM was subject to economic prejudice as a result of plaintiff's delay in filing suit, defendant asked this Court to reconsider its decision on laches. This Court declined to entertain the motion as one for reconsideration but stated that, if defendant chose, it could make a second motion for summary judgment. (See Order, Feb. 7, 2012.) Defendant chose to make a second motion – that motion was fully briefed on March 9, 2012.

At a conference on March 16, 2012, this Court orally denied defendant's renewed motion for summary judgment. (Tr. at 2:13-20, Mar. 16, 2012.) Based on the submissions of the parties, the Court found that there were disputed issues of fact regarding whether RIM had suffered any economic prejudice resulting from plaintiff's delay in bringing suit, and determined that limited discovery as to that issue was warranted before the Court could make the factual determinations necessary to deciding the merits of the laches defense. (Id. at 3:14-5:8.) Based on the fact that laches is an equitable issue to be tried to the Court and not jury, this Court also determined that it would be most efficient

3

to reach a prompt final determination as to the issue of laches. (Id. at 2:11-13.) The Court then set a schedule for discovery limited to the laches issue and set April 19, 2012 as the date for a bench trial solely on the issue of whether RIM suffered any economic prejudice as a result of plaintiff's unreasonable delay in commencing suit. (Id. at 2:5-8:22.) The Court stated that after a final determination on laches, this case would either proceed to the merits on the inventorship claim, or would be disposed of entirely. (Id. at 19:16-17.)

On April 19, 2012, this Court held a one day bench trial on the issue of whether RIM suffered any economic prejudice as a result of plaintiff's unreasonable delay in bringing suit. Each side made opening statements, presented evidence and submitted post-trial memoranda. This Court has now made findings of fact and conclusions of law on laches as set forth herein.

Based on the evidence presented at trial, this Court finds that RIM has and will suffer economic prejudice directly related to plaintiff's unreasonable delay in filing this lawsuit. Accordingly, since laches presents an entire defense to plaintiff's sole remaining claim in this action (correction of inventorship), this case is now dismissed with prejudice.

FINDINGS OF FACT

In connection with defendant RIM's initial motion for summary judgment, this Court determined that plaintiff had

unreasonably and inexcusably delayed in commencing this lawsuit. Mahmood, 2012 WL 242836, at *7. As discussed above, however, this Court also found that there was an open question as to whether that delay resulted in economic prejudice to RIM — that is, economic prejudice that it would not have suffered had plaintiff commenced the lawsuit sooner. (Id. at 20.)

Based upon the evidence presented at trial, this Court has determined that at the time that plaintiff knew or should have been on inquiry notice of his claims, the only patent that had issued arguably relating to plaintiff's PageMail invention — i.e., the software solution that plaintiff had developed and alleges is the basis for BlackBerry's email technology — was the '694 patent. Krishna Pathiyal ("Pathiyal") testified credibly as to RIM's intellectual property strategy, how the passage of time has impacted that strategy with regard to the '694 patent and RIM's internal investigation of plaintiff's claims in 2004.

I. Pathiyal Testimony

Pathiyal was hired by RIM in 1999 to develop a patent portfolio and strategy. (Tr. at 63:7-22, April 19, 2012.) He was personally involved in the '694 patent and mining that patent for other possible assets. (Id. at 69:10-19.) He and others at RIM identified a dozen or more major categories of invention relating to the '694 patent. (Id. at 71:16-23.) This resulted in a host of other, related patent applications submitted all over

5

the world. (Id. at 73:1-13.) Pathiyal testified credibly at trial that when plaintiff raised questions regarding whether he was an inventor of the invention reflected in the '694 patent, in whole or in part, that RIM undertook an internal investigation. (See e.g., id. at 105:3-108:22.)[2]

RIM's investigation included analysis of a variety of materials including, *inter alia*, lab notebooks of individuals associated with the '694 patent, interviews with relevant people within RIM and review of the source code associated with the '694 patent. (See e.g., id. at 189:21-24.) In a series of correspondence exchanged between RIM and plaintiff, RIM repeatedly requested that plaintiff provide it with any information that he had with regard to the merits of his claim of inventorship. (See e.g., id. at 101:24-102:15.) On more than one occasion, plaintiff stated that such information would be forthcoming but it never was. (See e.g., id. at 111:10-13.) In a single fax, plaintiff outlined several general areas that he believed demonstrated that he was an inventor of the '694 patent. (Id. at 101:14-104:10.) Pathiyal testified credibly that this fax did not provide RIM with any factual basis upon which to make a determination that plaintiff had any role in the invention of the '694 patent. (Id.) While plaintiff had repeatedly told RIM that he had additional information, none was

---

[2] The Court found Pathiyal credible as to all topics upon which he testified.

6

forthcoming and RIM had to proceed based on the information available to it at the time. (Id. at 102:10-15, 107:17-108:22, 122:15-23, 120:4-5, 227:12-228:1, 226:12-19, 227:19-21; Def.'s Ex. 8, Def.'s Ex. 10.)

Relatedly, plaintiff has asserted that he discovered certain "corroborating evidence" in a box in his brother's garage in 2009. (Mahmood Decl. ¶ 67, Dec. 16, 2011.) In connection with his opposition to RIM's original motion for summary judgment, plaintiff argued that laches does not bar his correction-of-inventorship claim because he could not have brought his claim prior to making this discovery. (See Pl.'s Mem. of Law in Opp. to RIM's Mot. to Dismiss the Compl. at 5, Oct. 6, 2011.) In the January 23, 2012 decision on that motion, this Court noted that that box apparently contained floppy disks and other "materials supportive of his claim." Mahmood, 2012 WL 242836, at *2. The Court also determined that it was fairly easy for plaintiff to locate this box and it was inexcusable that he had not done so earlier. Id. at *6. In reliance, in part, on plaintiff's declaration reciting the contents of the box, this Court determined that there appeared to be sufficient existing evidence that defendant could not support a claim for "evidentiary prejudice" resulting from the unreasonable delay. Id. at *8.

7

Pathiyal testified that had RIM received additional, specific information regarding plaintiff's claims, RIM certainly would have taken that information into consideration in coming to its determination as to an appropriate course of action. (See e.g., Tr. at 137:9-16, April 19, 2012.) In the absence of such information, however, RIM had to base its actions on what it had available from its own records. Pathiyal testified that when RIM conducted its investigation in 2004 it did not have access to any source code for plaintiff's PageMail invention. (Id. at 132:5-16.) According to plaintiff's affidavit, that source code was contained in the box he located in 2009. (Mahmood Decl. ¶ 67, Dec. 16, 2011.)

Pathiyal testified that RIM is very serious and careful regarding intellectual property rights. It does not take unnecessary risks with respect to its patent portfolio. (See e.g., Tr. at 92:14-19, April 19, 2012.) From time to time, RIM has been approached by individuals claiming rights in a RIM invention or patent. (See e.g., id. at 89:17-90:3.) RIM has handled those issues in a variety of ways: it has obtained a license (id. at 91:8-5), it has included the individual as an inventor (id. at 95:4-10), it has attempted to invent around the invention (id. at 86:4-15), and it has investigated and determined that the individual's assertions are sometimes without basis (id. at 219:15-25). Pathiyal testified to two

specific instances (regarding NTP, Inc. and InPro) in which third parties claimed that they had rights to certain technology and RIM designed around that technology. (Id. at 86:4-15.)

If RIM had information available to it that indicated that plaintiff's claims were substantiated, Pathiyal explained the several options RIM would have had in 2001 or even 2004: it could have provided a financial settlement, it could have designed around the patent, it could have obtained a license to the patent, it could have entered into some sort of business relationship with plaintiff, and/or it could have considered whether plaintiff should have been included as an inventor on the '694 patent. (Id. at 90:13-91:2; 135:15-138:22.)

Pathiyal provided support for these alternatives. For instance, in terms of design around, Pathiyal testified that this was a realistic option in 2001 or 2004. (Id. at 98:22-99:8.) There was, in fact, more than one way to achieve certain of the features of the '694 patent. Pathiyal explained that the '694 patent has claims relating to a single mailbox and Microsoft has itself invented a technology that has a single mailbox that is not on the same "technological path" as the '694 patent. (Id. at 175:9-12.) Moreover, Pathiyal presented a number of patents that listed non-RIM employees as inventors with RIM employees to support his assertion that RIM would have

9

considered, as one option, listing plaintiff as a co-inventor if merited. (Def.'s Ex. 27.)

Pathiyal testified that after RIM had conducted its 2004 investigation, based on the information available to it at that time, it committed itself to the '694 patent strategy. The delay in commencing this lawsuit, as Pathiyal testified, meant that RIM did not understand that there were real risks associated with this strategy. In reliance on its belief that it was the sole owner of the patent, RIM proceeded to develop a family of now more than 120 patents worldwide relating to the '694 patent, and that there were now 4,000 claims encompassed within those patents. (Tr. at 139:23-140:14, April 19, 2012.) This was in contrast to the fact that in 2001, the only patent that had issued was the '694 patent, which had a total of 36 claims. (Id. at 135:19-25.) According to Pathiyal, RIM was now committed to a very significant technology path to which it would not have committed itself to had plaintiff brought his claims earlier and RIM had an opportunity to investigate them. Pathiyal explained that the options available to RIM in 2001 and 2004 to deal with a claim of co-inventorship no longer existed, or were much more difficult to achieve, when plaintiff finally brought his suit in 2011. (Id. at 135:12-138:22.)

Pathiyal also testified that by proceeding to develop the '694 patent family, RIM had spent the time, resources and

10

creative energies of a host of engineers whose talents could have been directed towards developing alternative technologies. (Id. at 137:17-138:9.)

  II.  Adler Testimony

Plaintiff presented live testimony from Mark Adler ("Adler"). It was unclear what Alder was being offered as an expert in. His experience in patent "strategies" was derived almost exclusively from his job as Chief Intellectual Property Counsel at Rohm and Haas for over two decades. (Id. at 236:24-237:1.) In addition to that position, he has sat on various committees and boards with individuals from a number of different industries. (Id. at 240:12-241:12.) He readily conceded that he had never: prosecuted patents on mobile telecommunications devices, conducted research as to the prosecution strategies of mobile telecommunications device manufacturers, worked for a mobile telecommunications company or handled a situation, while working at Rohm and Haas, where a third party brought a patent infringement suit against his employer. (Id. at 244:2-245:17.) Adler also confirmed that he did not have expertise in determining economic prejudice. (Id.)

The testimony from Adler was based on his *ipse dixit*. When the Court posed questions, he appeared to agree that the facts facing RIM could indeed have resulted in prejudice, and then when questioned by plaintiff's counsel, he would take contrary

11

positions. (See e.g., id. at 282:7-12; 283:17-19; 283:21-284:5; 296:17-20; 300:3-9.) This Court finds that Adler's testimony was unreliable and unhelpful to this Court. It does not pass muster under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and the Court excludes it for that reason.

## CONCLUSIONS OF LAW

### I. Standard of Review

For the purposes of this proceeding, in order to prevail on its laches defense, defendant must demonstrate by a preponderance of the evidence that it suffered economic prejudice causally related to plaintiff's unreasonable delay in bringing suit. See A.C. Aukerman Co. v. R.L. Chaides Constr. Co., 960 F.2d 1020, 1032 (Fed. Cir. 1992).

### II. Laches and Economic Prejudice

As this Court set forth in its opinion dated January 23, 2012, familiarity with which is assumed herein, "laches is unacceptable neglect or delay in bringing suit which causes prejudice to the other party" and, if shown, bars an action. Mahmood, 2012 WL 242836, at *7. Laches consists of two elements: "(1) the plaintiff delayed filing suit for an unreasonable and inexcusable length of time from the time the plaintiff knew or reasonably should have known of its claim against the defendant, and (2) the delay operated to the prejudice or injury of the

12

defendant." Mahmood, 2012 WL 242836, at *7 (citing A.C. Aukerman, 960 F.2d at 1032). The doctrine is an equitable defense and should, accordingly, not be applied mechanically. Mahmood, 2012 WL 242836, at *7 (citing Holmberg v. Armbrecht, 327 U.S. 392, 396 (1946)). Instead, a determination as to whether a lawsuit is barred by laches depends on a weighing of the facts and circumstances surrounding the reasons for delay in bringing suit as well as whether the defendant to a suit when finally commenced has suffered any evidentiary or economic prejudice. Id. (citing A.C. Aukerman, 960 F.2d at 1032).

Here, as this Court found in the January 23, 2012 summary judgment opinion, plaintiff did unreasonably and inexcusably delay in commencing this lawsuit against RIM for more than six years after he knew, should have known or was on inquiry notice of his claim against RIM. Mahmood, 2012 WL 242836, at *7. This raised a rebuttable presumption of laches. Id. Plaintiff was able to show, however, that there was sufficient evidentiary material available to raise a triable issue of fact as to whether RIM had in fact experienced any evidentiary prejudice. Id. at *8. Moreover, the only evidence of economic prejudice presented by defendant at the time related to "mere investments and costs," which this Court found insufficient to establish economic prejudice on the motion for summary judgment. Id.

For the reasons stated in the Background section of this decision, the sole issue at the bench trial on April 19, 2012 was the economic prejudice, if any, suffered by RIM as a result of plaintiff's delay in filing suit. (Tr. at 8:8-13, Mar. 16, 2012.) Economic prejudice "may arise where a defendant will suffer the loss of monetary investments or incur damages which likely would have been prevented by earlier suit." Serdarevic v. Advanced Med. Optics, Inc., No. 06 Civ. 7107, 2007 WL 2774177, at *5 (S.D.N.Y. Sept. 25, 2007) (quoting A.C. Aukerman, 960 F.2d at 1033) (internal quotation marks omitted)). "This concept addresses something more than the damages that may be awarded for a finding of infringement; it is seeking evidence that there has been a change in the economic position of the alleged infringer during the period of delay." Id. (internal quotation marks omitted). See also Lake Caryonah Improvement Assoc. v. Pulte Home Corp., 903 F.2d 505, 510 (7th Cir. 1990) (economic prejudice found where defendant expended substantial resources developing and maintaining property for eleven years); ABB Robotics, Inc. v. GMFanuc Robotics Corp., 52 F.3d 1062, 1065 (Fed. Cir. 1995) (increasing sales expenditures and procuring additional patents in the same field may constitute economic prejudice); Radio Sys. Corp. v. Lalor, No. C10-828RSL, 2012 WL 254026, at *9 (W.D. Wash. Jan. 26, 2012) (a party's loss of the "opportunity to structure their business plans as they might

14

have had they known of the threat of litigation . . . is a recognized example of prejudice").

There must be a nexus between a plaintiff's unexcused delay in bringing suit and the change in economic position. A.C. Aukerman, 960 F.2d. at 1033 ("The courts must look for a *change* in the economic position of the alleged infringer during the period of delay." (emphasis in original)). See also Hemstreet v. Computer Entry Sys. Corp., 972 F.2d 1290, 1294 (Fed. Cir. 1992) ("The change must be because of and as a result of the delay."). Economic prejudice cannot result from a "business decision or gamble that the patent owner would not sue." Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp., 60 F.3d 770, 775 (Fed. Cir. 1995). A nexus has not been found, for instance, where plaintiff continued to pursue his rights and "left the attentive observer with little doubt of his intentions" — i.e., there can be no nexus where a defendant suffers economic prejudice in the face of a plaintiff that has made it clear he will be pursuing litigation. Hemstreet, 972 F.2d at 1294.

Irrelevant to the nexus inquiry is whether or not a defendant has been profitable. Financial success alone does not evidence a lack of economic prejudice. For example, in ABB Robotics, Inc. v. GMFanuc Robotics Corp., plaintiff failed to rebut a presumption of economic prejudice with a showing that defendant's sales had tripled during the period of delay. 828 F.

15

Supp. 1386, 1396 (E.D. Wisc. 1993), aff'd, 52 F.3d 1062 (Fed. Cir. 1995). In another case, Coleman v. Corning Glass Works, the court found economic prejudice despite the fact that defendant had earned $10 million in profits during the period of delay. 619 F. Supp. 950, 954-55 (W.D.N.Y. 1985), aff'd 818 F.2d 874 (Fed. Cir. 1987). As Judge Learned Hand has stated in the copyright context:

> It must be obvious to everyone familiar with equitable principles that it is inequitable for the owner of a copyright, with full notice of an intended infringement, to stand inactive while the proposed infringer spends large sums of money in its exploitation, and to intervene only when his speculation has proved a success. Delay under such circumstances allows the owner to speculate without risk with another's money; he cannot possibly lose, and he may win.

Haas v. Leo Feist, Inc., 234 F. 105, 108 (D.C.N.Y. 1916). Thus, while there must be a nexus between a plaintiff's delay and a defendant's economic prejudice, whether or not the defendant has been economically successful on the whole is not an issue.

### III. RIM Has Demonstrated Economic Prejudice

Plaintiff's primary arguments against a showing of economic prejudice boil down to one simple concept: that after RIM conducted its 2004 investigation, the die was cast. Put another way, plaintiff's claim that no lawsuit by plaintiff, no further evidence provided by plaintiff, would have caused RIM to have altered its course; therefore, there is no support for a nexus

16

between plaintiff's delay and any of the things defendant says it did in reliance on plaintiff's inaction, or what it would have done alternatively had plaintiff in fact acted. (See Pl.'s Post-Hr'g Br. at 3-8.)

Plaintiff's position finds no support in the record. While it is true, as this Court has found above, that RIM did conduct an internal investigation of plaintiff's claims in 2004, that investigation was based solely on the information to which RIM then had access. Plaintiff claimed to have more but his alleged evidence never materialized. It would be incredible for a business to have made a major strategic decision not to pursue a patent family because unsubstantiated assertions had been made. Equally, there is no evidence in the record, and there is evidence to the contrary, that had plaintiff in fact come forward with credible evidence of ownership, RIM would have seriously reviewed it and, if merited, undertaken an appropriate alteration in course.

In support of his position, plaintiff points to testimony from Pathiyal that after RIM was contacted by plaintiff in 2004 with his inventorship claims, it did not change its strategy. (See Pl.'s Post-Hr'g Br. at 1-2.) However, that does not answer the critical question: had plaintiff presented RIM with a lawsuit in which he made the sort of detailed factual allegations made in the instant lawsuit, or had plaintiff

17

provided the information that he repeatedly suggested he would provide, would that have altered RIM's strategy? That is a different question. Pathiyal testified at length that had RIM had sufficient information with which to judge the merits of plaintiff's claims, it could have pursued other options that would have lessened or eliminated the economic prejudice which RIM would now face. (Tr. at 90:13-92:19, 95:4-97:21, 132:17-133:6, April 19, 2012.) A negotiated resolution could have included a licensing arrangement, RIM could have changed its patent prosecution and enforcement strategy, designing around plaintiff's alleged contribution. (Id. at 85:18-23, 132:17-133:6.) Pathiyal corroborated that RIM would have undertaken such efforts by reference to specific other instances in which, when faced with other intellectual property disputes, it had done so. (See e.g., id. at 86:2-10, 92:24-93:5.) That none of these paths was undertaken is due to the lack of diligent pursuit by plaintiff — he frankly just disappeared for several years.

Plaintiff argues that his delay is of no consequence because the BlackBerry products that utilized the '694 patent family have been profitable for RIM. (See Pl.'s Post-Hr'g Br. at 9.) Plaintiff misunderstands economic prejudice. As explained above, the fact that RIM has made a profit on the technology does not speak to what RIM would have done differently had

18

plaintiff brought his suit earlier — i.e., RIM could both make a profit off of its BlackBerry products and suffer economic prejudice as a result of plaintiff's inexcusable delay in filing suit.

For example, if it now turned out that plaintiff should be listed as a co-inventor, that would mean that in the absence of another arrangement, plaintiff would have the right to license the '694 patent. See Ethicon v. U.S. Surgical Corp., 135 F.3d 1456, 1466 (Fed. Cir. 1998) (holding that an omitted co-inventor could grant a license under the patent to a third party). This could run directly counter to RIM's own developed licensing and marketing strategies — and could have been avoided, at least in large part, had plaintiff not waited over six years to bring his lawsuit. Such economic prejudice and turning a profit are not mutually exclusive.

Based on the extensive evidentiary record and the credible testimony from Pathiyal, RIM certainly suffered economic prejudice directly related to plaintiff's delay in bringing suit. Equity does not condone, and this Court will not allow, a plaintiff to make unsupported allegations of ownership, disappear for years while a company builds a successful business strategy around the very invention in which he asserts an interest, and then allow him to bring an untimely lawsuit.

19

## CONCLUSION

For the reasons set forth above, this Court finds that laches presents an entire defense to plaintiff's inventorship claim. Plaintiff's action is therefore DISMISSED with prejudice.

The Clerk of the Court is directed to terminate this action.

SO ORDERED.

Dated:  New York, New York
        May 16, 2012

_____
KATHERINE B. FORREST
United States District Judge